218 N.J. Super. 331 (1987)
527 A.2d 913
CUMBERLAND FARMS, INC., AND PENN VALLEY FARMS, INC., PLAINTIFFS-APPELLANTS,
v.
WOODSON W. MOFFETT, JR., INDIVIDUALLY AND AS DIRECTOR, DIVISION OF DAIRY INDUSTRY, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT. IN THE MATTER OF THE REVOCATION OF THE LICENSE OF ALLEN R. CASE, T/A THE CORNER STORE, BAPTISTOWN, NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1986.
Decided June 24, 1987.
*333 Before Judges MICHELS, O'BRIEN and LANDAU.
Sheldon A. Weiss argued the cause for appellant Cumberland Farms, Inc.
Edmund R. Bernhard argued the cause for appellant Allen R. Case (Bernhard, Durst & Dilts, attorneys; Edmund R. Bernhard, on the brief).
Gregory Romano, Deputy Attorney General, argued the cause for respondent Woodson W. Moffett, Jr. (W. Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Gregory Romano and Neil D. Magnus, Deputy Attorney General, on the brief).
Roland Morris, of the Pennsylvania Bar, admitted pro hac vice, argued the cause for amicus curiae New Jersey Milk Industry Assoc., Inc. (Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, attorneys; Steven M. Goldman, of counsel; Steven M. Goldman and Jerald D. Baranoff, on the brief; Duane, Morris & Heckscher, of the Pennsylvania Bar; Roland Morris, David C. Toomey and Dean C. Waldt, of the Pennsylvania Bar, of counsel and on the brief).
The opinion of the court was delivered by LANDAU, J.S.C. (t/a).
These are consolidated appeals which raise certain common questions respecting the regulation of milk sales in New Jersey. This marks yet another chapter in the long legislative and litigation history of this embattled industry.
*334 Proceeding under R. 2:2-3(a)(2) Cumberland Farms, Inc. (Cumberland) challenges rules promulgated by the Division of Dairy Industry, in the Department of Agriculture (Division) as N.J.A.C. 2:52-6.1 and N.J.A.C. 2:53-3.1, which prohibit sales below cost by licensed milk dealers and licensed stores respectively; and N.J.A.C. 2:52-3.1 and N.J.A.C. 2:53-4.1, which impose prior notice requirements upon changes in source of supply by dealers and stores respectively. Cumberland's appeal purports to attack the rules both facially and as-applied. It also contends that the so-called "presumptive cost guidelines" promulgated periodically by the Director amount to regulation, yet are not subject to challenge by hearing.
Allen R. Case, t/a The Corner Store (Case) appeals from the final decision of the Director, Division of Dairy Industry revoking his license to sell milk for violation of the sales below cost regulations. This decision was rendered after a full administrative hearing on the record. Although he did not do so below, Case here challenges the above regulations and guidelines substantially on the same grounds as Cumberland.
On leave granted the New Jersey Milk Industry Association, Inc. has participated in this appeal as amicus curiae.

FACTS

CUMBERLAND FARMS
Cumberland Farms is a vertically integrated "jug store" milk dealer[1] with a processing and packaging facility as well as a *335 chain of retail outlets which trade under the same name. It desires to expand its operations to include wholesale sales to other non-processing milk sellers such as supermarket chains.
The present controversy between Cumberland and the Division arose in late September 1984 when Cumberland, as a short-term "promotion," reduced its store milk price from $1.89 to $1.79 per gallon. The Director subsequently denied Cumberland's license application pursuant to N.J.S.A. 4:12A-35(5), due to its continued failure to provide the Division with records to enable it to determine whether Cumberland was selling at a price below its cost. Cumberland was notified of its right to a hearing under N.J.S.A. 4:12A-34, but has never participated in such a hearing. On at least one occasion the Director, citing Cumberland's unlicensed status, declined to address a notice of intent to change suppliers, submitted by a potential Cumberland customer. N.J.A.C. 2:53-4.1. Attempts at adjustment under N.J.S.A. 4:12A-43 proved unsuccessful.
On December 21, 1984, Cumberland filed this appeal pursuant to R. 2:2-3(a)(2) challenging the validity of the below-cost and notice regulations and seeking review of the Director's action with respect to its milk dealers license. Cumberland also sought emergent relief under R. 2:9-8.
On January 7, 1985, by order of this court Cumberland's emergent application was dismissed as moot in view of a stipulation entered into whereby the Division agreed to issue Cumberland a license, on condition that it turn over the requested records.
As the record now stands, the challenged regulations have yet to be applied to Cumberland.
We note that without moving under R. 2:5-5(b), Cumberland has attempted to supplement the record provided on appeal *336 under R. 2:5-4(b), with references to events occurring subsequent to filing this appeal. These materials are not properly before us and will not be considered. Cherry Hill Dodge, Inc. v. Chrysler Credit Corp., 194 N.J. Super. 282 (App.Div. 1984).

CASE t/a "THE CORNER STORE"
The Case matter began in March 1982, when the Division notified Case that in its opinion, the price at which the "Corner Store" was selling milk was below its cost in violation of N.J.A.C. 2:53-3.1. The letter requested that Case either adjust his price, document the meeting of competition or show that his price was above all the elements of cost as set forth in N.J.A.C. 2:53-3.2. Further, the Division set the matter for an informal hearing as provided by N.J.S.A. 4:12A-43. Case did not comply with any of the three requests contained in the letter nor did he appear at the informal hearing.
In July 1982, the Division filed a complaint in the Superior Court, Chancery Division, Mercer County, which resulted in an order requiring Case to comply with Division regulations. Case did not appeal from this order.
Through his accountant, Case attempted to provide the Division with information that showed that Case's price was higher than all his cost elements. After its own audit, the Division rejected this study since it did not reflect all the elements of costs enumerated in N.J.A.C. 2:53-3.2. The Division asked Case to adjust his price accordingly. Case did not accept these conclusions. The Division notified him in March 1983 that his license to sell milk was revoked subject to his statutory right to a hearing. Case requested a hearing under N.J.S.A. 4:12A-34, and the matter was referred to an Administrative Law Judge (ALJ).
In August 1984 the ALJ issued his Initial Decision in which he found that Case failed to calculate his cost of selling a gallon of whole white milk in accordance with N.J.A.C. 2:53-3.2. The ALJ further found that Case was selling milk at a price below his cost contrary to N.J.A.C. 2:53-3.1.
*337 On February 7, 1985, after the ALJ's decision became final under N.J.S.A. 52:14B-10 and attempts at informal adjustment under N.J.S.A. 4:12A-43 had failed, the Director adopted the ALJ's findings of fact and conclusions of law and issued an order revoking Case's milk license effective February 25, 1985. Case appeals from this order.
On appeal, in addition to joining Cumberland's facial and as-applied attack on the below cost and notice regulations, Case argues that the records submitted by it substantially comply with N.J.A.C. 2:53-3.2 and therefore the Director's decision revoking his license is arbitrary and unreasonable.

CHALLENGES TO THE REGULATIONS
Appellants[2] challenge the validity of the above-referenced rules and guidelines on grounds that:
(A) N.J.A.C. 2:52-6.1 and 2:53-3.1 which prohibit any milk dealer or store from selling milk below cost, without requiring a predatory, anti-competitive or antisocial intent or effect are *338 facially invalid as violative of the substantive due process requirements of the Federal and State Constitutions. In other words, it is urged that sales below cost in the milk industry cannot be declared per se unlawful;
(B) The "sales below cost" and "prior approval" regulations have been applied in conjunction with the "presumptive cost guidelines" to effectively "fix" minimum sales prices at both wholesale and retail levels without opportunity for hearing pursuant to N.J.S.A. 4:12A-23. Thus, it is argued that the present regulatory scheme has a "clear capacity for arbitrary and discriminatory application." Appellants maintain the regulatory scheme is a means of maintaining minimum milk prices contrary to "the strong public policy expressions of the legislative and executive branches of government ...";
(C) The regulations as applied are pre-empted by federal law and violate the commerce clause. U.S. Const. Art. I Sec. 8;
(D) The "presumptive cost guidelines" have all the earmarks of a rule and therefore should be promulgated only after notice and hearing provided for the Administrative Procedure Act, (APA) N.J.S.A. 52:14B-1 et seq.
Before turning to consideration of the arguments, reference must be made to the long history of milk regulation litigation in this state. A comprehensive history may be gleaned from; Garden State Farms, Inc. v. Mathis, 61 N.J. 406 (1972); Garden State Farms, Inc. v. Hoffman, 46 N.J. 595 (1966); Abbotts Dairies v. Armstrong, 14 N.J. 319 (1954). We think it accurately summarizes this history to state that despite repeated challenges on constitutional and other grounds, milk price control regulation has consistently been upheld by the highest courts of this state and of the land, because of the legislatively perceived public interest in a stable milk supply. See, e.g., Mathis, 61 N.J. at 422; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). This court is bound by those repeated determinations. Policy objections should be directed to the legislative and executive branches of state government. *339 Cf. N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 600-601 (1967). As the legislation now stands it would be lawful to re-establish minimum price controls if deemed necessary, provided it be done within statutorily prescribed means. N.J.S.A. 4:12A-21 to 23.

THE CHALLENGED RULES

(A) BELOW COST RULES and PRESUMPTIVE COST GUIDELINES
As the Attorney General points out, contrary to Cumberland's assertion, the milk industry was not "deregulated" in 1980. Rather, at the behest of the executive branch, minimum milk prices were suspended in favor of strengthened regulations prohibiting the sale of milk below cost.[3] Thus, the Division *340 has tried to achieve stability in the industry by prohibiting only sales below cost.[4]
N.J.A.C. 2:52-6.1 and N.J.A.C. 2:53-3.1 were adopted and later amended in accordance with N.J.S.A. 52:14B-4.
The rules in present form provide in relevant part:
2:52-6.1 Sales below cost prohibited
It shall be unlawful and a violation of these regulations for any dealer licensee to directly or indirectly be a party to, or assist in, any transaction to sell or offer to sell milk and milk products within the State of New Jersey, or for sale in the State of New Jersey at less than the cost thereof as hereinafter defined; but nothing in this regulation shall prevent a dealer from meeting the price or offer of a competitor for a product or products of like quality and nature in similar quantities; ...
2:52-6.2 Cost defined
The term `cost' as used herein shall include, but not be limited to, the basic cost of raw or reconstituted milk or derivatives thereof as determined in accordance with the joint State-Federal orders administered by the Division of Dairy Industry and the United States Department of Agriculture in the State of New Jersey; the cost of any added ingredients; and all other costs associated with the business of the dealer, for example, but not limited to, the cost of material, labor, salaries of executives and officers, the cost of receiving, cooling, processing, manufacturing, storing and distributing the product sold; rent, depreciation, selling expense, maintenance charges, delivery expense, license fees, taxes, insurance, advertising, advertising allowances, gifts, free service and all other costs as may be incurred, allocated proportionately to each unit of product sold in accordance with generally accepted cost accounting principles.
2:53-3.1 Sales below cost prohibited
It shall be unlawful and a violation of these regulations for any licensed store to offer for sale or sell milk or milk products at less than the cost thereof as hereinafter defined; but nothing in this regulation shall prevent a store from *341 meeting the price or offer of a competitor for a product or products of like quality sold in similar quantities; provided, however, that the burden of proving and properly documenting the meeting of a competitive price shall rest with the licensee asserting the claim; ...
2:53-3.2 Cost defined
The term `cost' as used herein shall include the net invoice cost of the milk and milk products plus all other costs directly or indirectly related to the sale of the milk and milk products. Such cost shall be determined in accordance with generally accepted costs accounting principles and be allocated proportionately to each unit of product sold and shall include without limitation all salaries of executives and officers, all costs of labor, rent, depreciation, selling, maintenance, delivery, license fees, taxes, insurance and all other costs as may be incurred by the store.
In conjunction with these rules the Director periodically issues "presumptive cost guidelines" to facilitate the enforcement thereof. The guidelines set forth a "presumptive cost-price," above which a seller is neither investigated nor challenged. It is designed to allow each licensee to know whether the Director will request cost justification data for a given price.
The presumptive cost guideline for July 1985 stated:
Stores may sell at a lower price, if the sale price is not below their net invoice cost for milk and milk products plus all other costs related directly or indirectly to the sale of milk. Also, stores may meet competition regardless of the cost.
The Director says he does not "enforce" the presumptive cost price, and acknowledges that access to a licensee's records must be obtained before its actual cost can be determined. No one disputes that the Director retains the burden of proof to establish a below cost violation.
In its brief the Milk Association points out that, as a matter of practice, a seller who anticipates selling at a price below the "presumptive cost-price," need not risk investigation and possible revocation. Rather, it may submit cost data to the Division for approval in advance of lowering its price. The existence of this practice has not been challenged. We also note that there is available an informal adjustment procedure under N.J.S.A. 4:12A-43, which allows for payment of a penalty in lieu of license revocation.

*342 THE NOTICE RULES
The Director has also adopted rules N.J.A.C. 2:52-3.1 and N.J.A.C. 2:53-4.1, the former of which Cumberland claims is being applied so as to effectively fix a minimum wholesale milk price contrary to N.J.S.A. 4:12A-22.1. These rules adopted and later amended in accordance with the APA require notice and approval of proposed changes in sources of milk supply by both milk dealers and stores and expiration of a time period before such changes can be made. They were designed to insure payments to dairy farmers for milk already delivered and to prohibit retaliation by increase in price or discontinuance of service for licensees which give such notice.

THE CHALLENGE TO REGULATIONS BY CUMBERLAND
We decline to resolve the as-applied aspect of Cumberland's argument because the regulations have yet to be applied to it. There has been neither a record nor an administrative determination made which would permit a proper review of the as-applied issues.
Cumberland has failed to exhaust its administrative remedies or, perhaps more accurately, has elected not to do so. Although the doctrine is not mandatory, Abbott v. Burke, 100 N.J. 269, 297 (1985), its salutary purpose is to ensure that a record be made before the body possessing expertise in the area. It allows the parties and regulatory agency to create a record necessary for meaningful appellate review and leaves open the possibility that resort to the courts will prove unnecessary. City of Atlantic City v. Laezza, 80 N.J. 255, 265 (1979).
As previously noted, Cumberland's unilateral and unauthorized supplement to the record raises sensitive issues suggestive of nefarious purposes of the Division which may well call for exploration, but not in the first instance within the limited structure of an appellate review. We decline therefore, to consider Cumberland's claim that the challenged regulations *343 and guidelines are being applied to effectively fix minimum wholesale and retail milk prices without prior hearing.
We turn to Cumberland's appeal as to the facial validity of the challenged rules. See Abbott v. Burke, 100 N.J. at 299. (Facial constitutional challenges to statutes should be judicially resolved, even where an as-applied challenge to a statute may strongly suggest need for initial agency adjudication.) Appellants argue that the below cost regulations violate substantive due process because they fail to require that predatory or anti-competitive intent be shown. We are satisfied that the below cost regulations, if constitutional, are within the scope of delegation reasonably contemplated by the enabling statute. See N.J.S.A. 4:12A-21; Mathis, 61 N.J. at 424-425; D.S. v. East Brunswick Tp. Bd. of Ed., 188 N.J. Super. 592, 593 (App.Div. 1983), certif. den. 94 N.J. 529 (1983).
Appellants cite a "long and unbroken" line of federal and state authorities for the proposition that outright prohibition of sales below cost is facially unconstitutional, regardless of whether the sale is "affected with a public interest." However, the cases cited are distinguishable. See e.g., United States v. National Dairy Prod. Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) and National Dairy Prod. Corp. v. United States, 350 F.2d 321 (8th Cir.1965) (a provision of the Robinson-Patman Act making it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor," held not unconstitutionally vague as applied to sales made below cost and with specific intent to destroy competition); Kentucky Milk Marketing v. Kroger Co., 691 S.W.2d 893 (Ky. 1985) (state milk law, held invalid, both facially and as-applied because it required minimum markups).
In Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Supreme Court held that New York legislation authorizing the setting of minimum milk prices was not violative of substantive due process under the Federal Constitution. The Court held that where businesses "affected with the public *344 interest" are concerned, there can be no doubt that, by appropriate measures, a state may regulate any of its aspects, including the prices to be charged for the products. Id. at 291 U.S. at 536-537, 54 S.Ct. at 515-516, 78 L.Ed. at 956-957. "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio." Id. at 291 U.S. at 537, 54 S.Ct. at 516, 78 L.Ed. at 957.
The New Jersey Supreme Court has chosen to equate substantive due process analysis under the New Jersey Constitution with that of federal constitutional law when examining price regulations. Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 560-561 (1975). In State Bd. of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 516-519 (E. & A. 1935), the Nebbia analysis was applied to sustain New Jersey milk legislation against a challenge under the State Constitution. In reviewing appellants' argument, we have applied the same approach.
The narrow question we must consider when passing upon substantive due process attacks upon price regulation is whether the legislative body could rationally have concluded that the unrestrained operation of the competitive market was not in the public interest. Hutton Pk. Gardens, supra, 68 N.J. at 564. Because this legislation has been upheld against constitutional attack so often in the past, the court need not dwell on its justification as a proper exercise of the police power.
The only New Jersey case which appellants have cited to support their contention is State v. Packard-Bamberger & Co., Inc., 123 N.J.L. 180 (Sup.Ct. 1939). There, the court declared unconstitutional legislation which penalized retailers for sale of any merchandise below cost. Among the grounds cited by the court was the absence of any requirement of wrongful intent. Id. at 188. However, the Packard-Bamberger court clearly *345 stated that the legislation there considered did not "relate only to the sale of commodities affected with a public interest, as in Nebbia v. New York." Id. at 189. In explaining the reason the legislation was different from other legislation found to be valid, the court noted:
In the act under consideration there is no limitation to transactions which involve commodities affected with a public interest, or to those which may be designed to injure competitors or destroy competition. Id. at 184-185 (Emphasis supplied).
"At this late date it cannot be disputed that the business of producing and distributing milk is affected with a public interest," Garden State Farms, Inc. v. Mathis, 61 N.J. at 422. Packard does not support appellants' argument that the regulations are invalid absent a requirement of predatory or anti-competitive intent.
A presumption of validity attends regulations lawfully adopted. Bergen Pines, 96 N.J. at 456. We conclude that the regulations are valid on their face as a proper exercise of the Director's wide powers legislatively delegated by N.J.S.A. 4:12A-21.

THE CASE APPEAL
This court's role in reviewing the Director's revocation of Case's license, for failure to properly calculate cost and for selling milk below cost, N.J.A.C. 2:53-3.1 and 3.2, is to determine whether these findings could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the agency's expertise. DeVitis v. New Jersey Racing Comm., 202 N.J. Super. 484, 489-490 (App.Div. 1985), certif. den. 102 N.J. 337 (1985).
Upon careful consideration of the record, particularly Case's cost submissions, we are persuaded that the ALJ's findings adopted by the Director are not arbitrary, capricious or unreasonable. *346 The ALJ and Director correctly concluded that Case's cost statement and calculations were inadequate and did not include all factors enumerated in N.J.A.C. 2:53-3.2. There will undoubtedly be situations where legitimately debatable cost disputes are encountered in application of N.J.A.C. 2:52-6 and N.J.A.C. 2:53-3.[5] This, however, is not such a case. The Director's decision revoking Case's license is affirmed.

THE PRESUMPTIVE COST GUIDELINES
Appellants assert that the presumptive cost guidelines have the characteristics and practical effect of an administrative rule and in consequence they improperly circumvent the notice and hearing requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 to 15 (APA). Thus, appellants would have us declare the regulatory scheme invalid.
It is generally acknowledged that an agency enjoys a great deal of flexibility in selecting the means most suitable to achieving its regulatory ends. Crema v. N.J. Dept. of Environmental Protection, 94 N.J. 286, 299 (1983). However, this flexibility is not without its limits. In Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313 (1984), the Supreme Court said:
We can synthesize from this authority that an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; *347 (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication. [Id. at 331-332]
On the record properly before us, the presumptive cost guidelines have none of the attributes of an administrative rule because they are not binding upon licensees, nor do they establish that other prices are unlawful. As resources of all regulatory agencies are typically limited, it is both reasonable and fair to announce to the industry a price level below which cost documentation will not be required. It is the policy of "no sale below cost" which must comply with rule-making requirements, and such compliance has occurred.
It is difficult for us to ascribe a "chilling" motivation to an agency which tells a regulated industry what its internal standards are for triggering investigatory inquiry. Why is it preferable that no one should know the level at which cost justification data might be required for licensees? Unless the guideline is employed in making substantive decisions affecting licensees, it does not partake of the nature of a regulation.
The presumptive cost guidelines are interpretative and informational. They may not be necessary, but they are not unlawful. Cf. Boller Beverages, Inc. v. Davis, 38 N.J. 138, 154 (1962). Licensees are not prevented from undertaking independent cost studies, pursuant to N.J.A.C. 2:52-6.2 and 2:53-3.2, or from submitting cost data to the Division for prior determination.
Affirmed.
NOTES
[1] "Vertically integrated `jug store' milk dealers" are retail milk sellers who purchase raw milk directly from producers, operate their own plants where the milk is processed and packaged, and sell it in their own stores to householders on a cash and carry basis. Most such sales are in half-gallon and gallon containers of various types. Such stores also carry a limited line of other foods and household items. They are to be contrasted with other retail milk sellers  large supermarkets, small independent grocery stores and unintegrated dairy stores  who do not process the milk they sell, but purchase it from wholesale milk dealers (processors-handlers) or subdealers, as well as with other forms of retail distribution  vending machines and home delivery routes. Garden State Farms, Inc. v. Mathis, 61 N.J. 406, 411 n. 1, 294 A.2d 713 (1972).
[2] Case did not raise the purely legal issue of the validity of the rules before the Division and ordinarily would be foreclosed from doing so here. However, we address his contentions, which parallel those of Cumberland, because matters of great public interest are involved. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973).

We reject the Division's claim that appellants' challenge to the regulations is untimely under N.J.S.A. 4:1-34. The appellants timely filed their appeals after being "aggrieved" by an "act" of the Director within the meaning of the statute. This determination makes it unnecessary to address whether N.J.S.A. 4:1-34 unconstitutionally usurps the rule-making power of the Supreme Court. See e.g., Como Farms, Inc. v. Foran, 6 N.J. Super. 306 (App.Div. 1950) (issue discussed but left unresolved).
We also reject the claim that appellants are foreclosed from challenging the regulations by Bergen Pines Hosp. v. Dept. of Human Serv., 96 N.J. 456 (1984), because they failed to offer comments on appeal when the regulations were first proposed and adopted. We do not read Bergen Pines as barring facial legal challenges to the constitutionality or to the authority of the Director to adopt particular regulations. Cf. Abbott v. Burke, 100 N.J. 269, 298-299 (1985). However, as discussed infra, Cumberland's failure to exhaust administrative remedies causes us to decline to determine its as-applied challenge.
[3] As stated by the Director in a 1979-80 Annual Report of the Department of Agriculture:

The issue of whether the [milk control] program would be continued dominated milk control activities during the year. A public hearing was held by the Governor to consider whether milk price control should be continued. Most of the testimony favored continuation. The principal proponent of deregulation was the Attorney General. Throughout the year Department of Agriculture representatives met with representatives of the Governor and the Attorney General to review the issue. Changes were made in other Division regulations, but no changes were made in minimum price regulations.
[Annual Report of the Department of Agriculture, at p. 8.]
By letter to milk dealers and other licensees in August 1980 and by formal notice of rule-making in October 1980 (12 N.J.R. 562-563), the Director proposed to delete N.J.A.C. 2:53-1.1 through 2:53-1.4, which mandated uniform minimum prices on fluid whole milk and to substitute the sales below cost prohibition. N.J.A.C. 2:53-3.1.
The August letter provides:
The net effect of the Board's action is to suspend minimum milk prices following publication of the proposal in the New Jersey Register.... The Board has left intact the prohibition against sales below costs at both wholesale and retail.
The October notice states:
Woodson W. Moffett, Jr., Director of the Division of Dairy Industry in the Department of Agriculture, pursuant to authority of N.J.S.A. 4:12A-1 et seq., proposes to repeal N.J.A.C. 2:53-1 concerning minimum prices on fluid whole milk and to amend N.J.A.C. 2:53-3.1 concerning sale of milk or milk products below cost.
[4] The wisdom of this approach [as distinct from the validity of the regulations] is not before us. See, e.g., Bergen Pines, 96 N.J. at 477-478. Presumably, there was a rational basis for the Director's decision, some seven years ago, that regulatory prohibition against sales below cost is a workable scheme reasonably calculated to best achieve the statutory purpose of milk regulation. Compare, Mathis, 61 N.J. at 429-430 (sufficient evidence to support Director's then conclusion to the contrary), in which Cumberland urged adoption of such sales below cost approach.
[5] As noted in Mathis, 61 N.J. at 430, "[c]omparable cost figures are most difficult to achieve. There is no uniform method of accounting and cost evidence can speak only as of one exact point of time, subject to very quick change by reason of any number of affecting factors, especially including volume at the particular time."